Bobby Gene YOUNG, Appellant
(Defendant),

v.

STATE of Indiana, Appellee (Plaintiff).

No. 45S00–9801–CR–9.

Supreme Court of Indiana.

Oct. 28, 1998.

Marce Gonzalez, Jr., Appellate Public Defender, Merrillville, for Appellant.

Jeffrey A. Modisett, Attorney General, Andrew L. Hedges, Deputy Attorney General, Indianapolis, for Appellee.

SELBY, Justice.

A jury convicted Bobby Gene Young ("defendant") of one count of murder, *see* IND. CODE § 35–42–1–1 (1998), one count of attempted murder, a class A felony, *see id.* (murder); IND. CODE § 35–41–5–1 (1998) (attempt), and one count of robbery, a class B felony, *see* IND. CODE § 35–42–5–1 (1998). The trial judge imposed concurrent sentences of fifty-five years for murder, twenty years for attempted murder, and ten years for robbery.[1] In this direct appeal, defendant raises one issue: Did the trial court commit reversible error in permitting one of the State's witnesses to make an in-court identification of defendant? We answer in the negative and affirm.

## FACTS

Defendant was convicted of the murder of Michael Brown and the robbery and attempted murder of Kimie Dante Stewart. The facts most favorable to the judgment follow.

Stewart lived in Gary, Indiana, with his mother, Eunice Nunn, and his father, Wayne Nunn. Brown, a close friend, also lived with the family. On the morning of November 15, 1996, Stewart borrowed his father's car, intending to drive with Brown to visit a friend.

On the way, Stewart saw two individuals with whom he was acquainted—defendant and William Hubbard, Jr. Stewart stopped the car, and Hubbard asked Stewart if he had any marijuana. Stewart replied that he did not, but he was going to see a friend who might have some and Stewart would get back with Hubbard and defendant later.

Hubbard then asked Stewart for a ride, and after Stewart agreed, Hubbard and defendant got in the back seat of the car. When Stewart had driven to the location Hubbard had requested, Stewart asked whose house it was. Receiving no answer, he turned and found that defendant had pulled a gun. Defendant waived his gun between Stewart's head and Brown's head. Hubbard then removed a gun from Stewart's pocket and pointed this gun at Stewart while defendant pointed his gun at Brown. Hubbard told Stewart he wanted the safe that Stewart kept at his house. Stewart told Hubbard that he had $10,000 in the safe and would give it to him if they returned to Stewart's house. Although Stewart did not have this much money and kept no money in the safe, he hoped that defendant and Hubbard would be satisfied with taking the safe. He advised Hubbard and defendant that his mother and father were at home and asked that they not be hurt.

Stewart drove through an alley and parked behind his house. All four men got out of the car and went into the house. Defendant kept a gun on Brown in the laundry area while Hubbard and Stewart went to Stewart's bedroom. Once there, Stewart told Hubbard that there was no money in the safe, but that he had $2800 behind a picture frame. Stewart retrieved the money and gave it to Hubbard. Hubbard asked if Stewart had any cocaine or marijuana, and Stewart retrieved a bag of marijuana from a storage room. Stewart and Hubbard returned to the laundry area where Brown and defendant were waiting. They all returned to the car, and Hubbard told Stewart to open the trunk. Hubbard then ordered Brown to

---

1. The jury convicted defendant of robbery as a class A felony, but the trial court reduced it to a class B felony at sentencing. The convictions of intentional murder and felony murder were merged, and the jury found defendant not guilty of confinement. Defendant raises no issues regarding sentencing on appeal.

get inside the trunk and told Stewart to drive. Stewart asked Hubbard not to kill them, and Hubbard responded: "Do you think I'm going to give you a chance to come back and get me?" (R. at 112.) Brown refused to get into the trunk and started backing away from the car. Hubbard told defendant to "handle" his "business." (R. at 113.) Stewart took off running with Hubbard in pursuit. shooting at him. The last time Stewart saw defendant that day, defendant was holding Brown.

As Stewart passed near his parents' bedroom window, he began shouting, "Daddy, help me, they're trying to kill me." (R. at 116.) As he ran, he heard what sounded like two guns being fired. He ran across the street in front of his house and took cover behind a car. With Hubbard approaching, he ran back toward his house, and he saw his father and mother on the porch. Stewart dove toward a tree in the yard and attempted to pull himself behind it. Mr. Nunn began shooting at Hubbard with a shotgun and Hubbard fled. Mrs. Nunn at one point turned to her right and saw another man, whom she later identified as defendant, coming around the side of the house. She watched this man flee between two houses.

Mrs. Nunn went to check on Stewart and brought him back into the house. He had been shot in the forearm and buttocks. Mrs. Nunn called for the police and an ambulance. Stewart and Mrs. Nunn then went to look for Brown and found him in the back yard, lying on his stomach, bleeding, and struggling to breathe. Brown later died of gunshot wounds to the head and abdomen.

On November 18, 1996, the State filed an information charging Hubbard and defendant with murder, attempted murder, robbery, and confinement. Defendant was tried before a jury on July 21 through 24, 1997. The jury returned verdicts of guilty on the counts of murder, attempted murder, and robbery. Defendant appeals. We have jurisdiction under Indiana Appellate Rule 4(A)(7).

## DISCUSSION

Less than a week before trial, with defendant's attorney present, Mrs. Nunn viewed a six-person lineup that included defendant as "number 3." The police asked if she recognized anyone as the person she had seen coming around the house on the day of the shooting. She said she could not take her eyes off number 3, but she was not positive. Later, after defense counsel had left, Mrs. Nunn told a police officer that the person she had seen the day of the shooting had been wearing a skull cap. According to Mrs. Nunn, the officer asked whether she could have made a one hundred percent certain identification of number 3 if he had worn a skull cap in the lineup, and she answered affirmatively. She repeated that she could not keep her eyes off number 3, adding that she would know those eyes and mouth anywhere because she and the person had looked at each other in the face on the day of the shooting. The officer asked if she had seen the person before the day of the shooting, and she said to the best of her knowledge she had not. He then asked if she had seen him since that day, and she said, "today," meaning the day of the lineup. (R. at 226.) The following day, defense counsel was informed of Mrs. Nunn's post-lineup statements.

The State did not introduce any evidence relating to Mrs. Nunn's attempt at a pretrial identification. However, on direct examination she made an in-court identification of defendant as the man she had seen coming around the house the day of the shooting. Defendant objected to Mrs. Nunn's in-court identification on the basis that it had been tainted by improper pretrial identification procedures, and the trial court overruled the objection. On cross-examination of Mrs. Nunn and of a police officer, defense counsel brought out the circumstances of Mrs. Nunn's less than definitive attempt at a pretrial identification.

■ Defendant contends that the procedures employed during Mrs. Nunn's attempted pretrial identification violated his Fourteenth Amendment right to due process and his Sixth Amendment right to counsel, and that the improper pretrial identification procedures so tainted Mrs. Nunn's in-court identification that it was reversible error for the trial court to admit it into evidence.

■ A defendant's Fourteenth Amendment due process right may be violated by the admission of identification evidence that is a product of unduly suggestive procedures. *See Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967). When, over a timely objection, a trial court has admitted evidence of an in-court identification by a witness who made or attempted to make a pretrial identification, the reviewing court must determine whether, under the totality of the circumstances, the pretrial confrontation was so impermissibly suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. *See Bell v. State,* 622 N.E.2d 450, 454 (Ind.1993). An otherwise permissible procedure to obtain an identification of a perpetrator may be violative of due process if it is accompanied by verbal communications that distinguish and emphasize a defendant in an unduly suggestive manner. *See id.* at 455.

■ The Sixth Amendment right to counsel attaches when an adversary judicial proceeding is initiated against the defendant and includes the right to have counsel present at a pretrial lineup. *See United States v. Wade,* 388 U.S. 218, 236–37, 87 S.Ct. 1926, 1937, 18 L.Ed.2d 1149, 1162–63 (1967); *Hatcher v. State,* 275 Ind. 49, 414 N.E.2d 561, 563 (1981). When the police conduct a lineup without defense counsel at a time when the defendant has the right to have counsel present, evidence of the witness' identification at the lineup is inadmissible. *See Gilbert v. California,* 388 U.S. 263, 273, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178, 1186 (1967); *Hatcher,* 414 N.E.2d at 563.

■ Nevertheless, a witness who participates in an improper pretrial identification procedure may identify the defendant in court if the totality of the circumstances shows clearly and convincingly that the witness has an independent basis for the in-court identification. *See Wade,* 388 U.S. at 239–40, 87 S.Ct. at 1939, 18 L.Ed.2d at 1164; *Utley v. State,* 589 N.E.2d 232, 238 (Ind. 1992); *Wethington v. State,* 560 N.E.2d 496, 502 (Ind.1990); *Hatcher,* 414 N.E.2d at 563–64. Factors to be considered in making this determination include the amount of time the witness was in the presence of the perpetrator, the distance between the two, the lighting conditions, the witness' degree of attention to the perpetrator, the witness' capacity for observation, the witness' opportunity to perceive particular characteristics of the perpetrator, the accuracy of any prior description of the perpetrator by the witness, the witness' level of certainty at the pretrial identification, and the length of time between the crime and the identification. *See Utley,* 589 N.E.2d at 238.

Defendant argues neither that the lineup Mrs. Nunn viewed was itself unduly suggestive, nor that Mrs. Nunn's statement during the lineup that she couldn't take her eyes off number 3 was a product of unduly suggestive procedures. Moreover, defense counsel was present during the lineup itself, and thus there is no basis to find that either defendant's Fourteenth or Sixth Amendment rights were violated up to the point defense counsel left. Mrs. Nunn's testimony, however, indicates that the police may have focused her attention on defendant after defense counsel had departed.

We need not decide whether the events that transpired after the lineup violated defendant's Fourteenth or Sixth Amendment rights, however, because we conclude that the totality of the circumstances clearly and convincingly demonstrates that Mrs. Nunn had an independent basis for her in-court identification. Mrs. Nunn testified that she was just two or three feet away from the person she saw coming around the house on the day of the shooting and that she got a good look straight into his face in broad daylight. In addition, the fact that she focused strongly on defendant during the lineup, albeit with less than total certainty, while defense counsel was present and before any arguably improper suggestiveness arose demonstrates that an independent basis for her in-court identification of defendant already existed prior to the alleged constitutional violations. *Cf. Williams v. State,* 455 N.E.2d 299, 302–03 (Ind.1983) (less than certain in-court identification of defendant was admissible). Under these circumstances, the trial court did not err in permitting Mrs. Nunn to identify defendant in court. The

events of Mrs. Nunn's attempted pretrial identification were fully explored on cross-examination of both Mrs. Nunn and a police officer. It was up to the jury to determine what weight to give Mrs. Nunn's in-court identification in light of her earlier lack of complete certainty. *See Harris v. State,* 619 N.E.2d 577, 581 (Ind.1993) (inconsistencies in identification testimony affect credibility of witness, not admissibility of identification).

## CONCLUSION

We affirm the convictions of Bobby Gene Young for murder, attempted murder, and robbery.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.