

**FILED**

Oct 08 2015, 8:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert E. Quinn,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 8, 2015

Court of Appeals Case No.
20A03-1503-CR-82

Appeal from the Elkhart Superior
Court.
The Honorable George W.
Biddlecome, Judge.
Cause No. 20D03-1303-FA-14

**Barteau, Senior Judge**

# Statement of the Case

[1] Robert E. Quinn appeals his convictions of child molesting, a Class B felony,[1] and criminal confinement, a Class B felony.[2] We affirm.

# Issue

[2] Quinn has preserved one issue for appellate review: whether the charges of child molesting and criminal confinement are barred by the statute of limitations.

# Facts and Procedural History

[3] On the night of March 5, 1988, ten-year-old E.F. was asleep on a couch in the living room of her family's house in Elkhart County. E.F.'s parents were not at home, and E.F.'s brother was asleep in another room. Suddenly, Quinn forced open the front door, damaging the door frame, and entered the house. As E.F. awoke, he covered her head with a coat, picked her up, and carried her outside. Quinn got into his car with E.F. and drove away, holding her in a headlock.

[4] Later, Quinn stopped the car. E.F. could not see where she was or the face of her kidnapper because the coat was covering her face. Quinn put her on her back on the driver's side of the front seat. E.F. cried and tried to remove the coat. Quinn punched her in the face, told her to quit crying, and threatened to

---

[1] Ind. Code § 35-42-4-3 (1981).

[2] Ind. Code § 35-42-3-3 (1985).

kill her and her family "with a knife" if she kept crying or told anyone about the abduction. Tr. p. 298.

[5] Quinn pushed E.F.'s nightgown up to her shoulders and rubbed her chest. He removed her underpants and unsuccessfully attempted to insert his penis in her vagina, inflicting intense pain on E.F. Next, E.F. felt Quinn smearing a substance on and inside of her vagina with his fingers. It burned. She asked him what the substance was, and Quinn said it was Vaseline.

[6] After applying the Vaseline, Quinn inserted his penis into E.F.'s vagina. The pain caused E.F. to pass out for a short time. At one point she gripped the steering wheel and tried to pull away, but Quinn held her in place. Quinn inserted his penis in her vagina a second time, and she passed out again. Eventually, Quinn moved E.F. back to the passenger side of the front seat and told her to keep the coat on her head. He started the car and began driving. E.F. found her underwear and put it back on.

[7] Quinn stopped at a video rental store next to E.F.'s house and told her to get out. She got out as fast as she could and went inside her house. E.F. saw blood in her underwear and used toilet paper and a washcloth to try to clean up. She was still in pain. After E.F. cleaned up as best she could, she hid the washcloth behind the toilet. Next, she sat on her bed. E.F. remembered Quinn's threat to kill her family if she told anyone. She did not wake her brother.

[8] When E.F.'s parents returned home at two or three in the morning, they saw that the front door had been broken open. E.F.'s mother found E.F. sitting in

bed. E.F., who was afraid that her mother would be angry, told her mother that she had started her period. E.F.'s mother continued questioning her and told E.F.'s father to call the police.

[9] Detective Gary Kenawell of the Elkhart County Sheriff's Department was dispatched to E.F.'s house. By the time he arrived, E.F. had already been taken to the hospital. Several other officers were present at the house and had collected E.F.'s nightgown and underwear, as well as the toilet paper and the washcloth she had used to clean up. The officers stored the items in bags, to which they affixed evidence tags that stated a case number, the date, the collecting officers' names, the house address, and a description of the contents.

[10] At the hospital, a doctor examined E.F.'s injuries and performed a sexual assault examination. Police officers collected the sexual assault evidence kit, which was marked as State's Exhibit 8 at trial. Doctors later performed surgery on E.F. to repair severe vaginal lacerations caused by Quinn's attack.

[11] Detective Kenawell went to the hospital, where he questioned E.F.'s father and brother. At his request, they went to the sheriff's department, where they gave formal statements. He later questioned E.F. while she was still hospitalized, but she was unable to describe her attacker. At that time, Quinn was a stranger to E.F.'s family, but it was discovered years later that he and E.F.'s family had lived in the same neighborhood.

[12] Detective Kenawell and other officers canvassed houses and businesses near E.F.'s house to find out if anyone had seen anything, but their questioning did

not yield any results. Another officer told Detective Kenawell to consider Quinn as a suspect. The record does not disclose the reasons for the officer's suspicion, but Detective Kenawell's investigation did not tie Quinn or any other person to E.F.'s kidnapping and rape.

[13] E.F. and her family members regularly spoke with the police for several months, but the investigation was hampered by a lack of leads. In July 1988, the sheriff's department put the case in inactive status, meaning that no further investigation would be undertaken absent new information. In October 1988, E.F.'s father called the police with information about a possible suspect, but the lead did not pan out. E.F.'s father periodically called the police over the next several years, requesting status updates.

[14] Meanwhile, an officer had delivered the sexual assault evidence kit, two pairs of E.F.'s underpants, her nightgown, the washcloth, and the toilet tissue to the Indiana State Police Laboratory (the Lab) on March 10, 1988. At that time, the Lab used "ABO typing" to test blood samples. *Id.* at 161. It was an accurate but rudimentary analysis that could only exclude a suspect from a blood sample rather than identifying the suspect as the definitive source. Blood testing revealed that the underpants, washcloth, and nightgown contained blood that was consistent with E.F.'s blood standard, but no further information could be obtained. Several pieces of evidence had seminal fluid or spermatozoa on them, but at that time the Lab had no testing procedures that could link those substances with a specific person.

[15] In 1988, the Lab's policy was to take clippings known as sub-items from pieces of evidence and test the sub-items rather than the entirety of each item. The Lab returned each item, minus the portion that was removed to create the sub-item, to the appropriate law enforcement agency. The Lab still makes use of sub-items today. Currently, the Lab has a practice of keeping sub-items "in perpetuity." *Id.* at 180. In the 1980s, the Lab had no formal retention policy, but an analyst could retain and store a sub-item if he or she wanted.

[16] Prior to 2000, the Elkhart County Sheriff's Department destroyed the evidence in its possession that was related to this case. Kim Epperson, the Lab analyst who performed the blood testing in 1988, chose to store the sub-items. They remained in storage at the Lab's Indianapolis vault over several decades.

[17] In the early to mid-1990s, the Lab began to use DNA analysis. Over the years, the Lab adopted more advanced DNA analytical methods as they became available. The newer methods are better able to tie specific individuals' DNA profiles to DNA profiles of unknown individuals found on pieces of evidence. In 1998 or 1999, the Combined DNA Index System, or CODIS, was put into service. CODIS is a nationwide DNA database and has sub-databases for each state. DNA profiles are stored in CODIS, and law enforcement agencies can compare DNA profiles generated from pieces of evidence against the DNA profiles in CODIS to find a match. Indiana began submitting DNA profiles to CODIS in 2000.

[18] The Elkhart County Sheriff's Department does not have a policy for reopening inactive cases. On occasion, detectives ask forensic specialists to look at older cases to see if there is any evidence that can be submitted for DNA testing, but there is no formal system or schedule. Similarly, the Lab does not have a formal procedure for testing older sub-items from the vault. Due to the sheer volume of evidence, the Lab acts only in response to requests from law enforcement agencies. It can take at least a week for an analyst to create a DNA profile from one sample, and there are "thousands and thousands of old case samples" in the Lab's vaults. *Id.* at 229.

[19] In September 2011, E.F. contacted Elkhart County officials about her case, looking for medical information. She was put in touch with Kenawell, who had retired from the sheriff's department and was an investigator for the prosecutor's office. Kenawell remembered E.F. and agreed to look into her case.

[20] Kenawell contacted an acquaintance at the Lab to see if the Lab still had any of the evidence from E.F.'s case. Lab personnel checked the vault and found the sub-items that Epperson had retained and placed in storage over two decades ago. In June 2012, Forensic Scientist Maranda Michael tested the sub-items and generated a DNA profile of an unknown male based on sperm fractions found on a sub-item that was part of the washcloth. Another Lab employee uploaded the DNA profile to CODIS and found a match with Quinn, whose DNA profile was already on CODIS.

[21]     In November 2012, the police sought and obtained a search warrant for a buccal swab from Quinn. The swab was submitted to the lab for testing in January 2013. In February 2013, Forensic Scientist Michael compared the profile generated from the buccal swab to the profile generated from the sub-items and determined that Quinn was the source of the sperm fractions found on sub-items that had been parts of the washcloth, the nightgown, and one pair of underpants.

[22]     On March 5, 2013, the State charged Quinn with child molesting, criminal confinement, and rape, a Class A felony. Quinn pleaded guilty to rape but moved to dismiss the remaining two charges, contending that they were barred by the statute of limitations. The trial court denied Quinn's motion and held a bench trial on those two charges. The court determined that Quinn was guilty and sentenced him accordingly. This appeal followed.

## Discussion and Decision

[23]     Quinn presents constitutional and statutory challenges to his convictions of child molesting and rape, but only the statutory claim has been preserved for appellate review.

[24]     At the time that the State charged Quinn, Indiana Code section 35-41-4-2 (2009) provided, in relevant part:

> (a) Except as otherwise provided in this section, a prosecution for an offense is barred unless it is commenced:

(1) within five (5) years after the commission of the offense, in the case of a Class B, Class C, or Class D felony; or

(2) within two (2) years after the commission of the offense, in the case of a misdemeanor.

(b) A prosecution for a Class B or Class C felony that would otherwise be barred under this section may be commenced within one (1) year after the earlier of the date on which the state:

(1) first discovers evidence sufficient to charge the offender with the offense through DNA (deoxyribonucleic acid) analysis; or

(2) could have discovered evidence sufficient to charge the offender with the offense through DNA (deoxyribonucleic acid) analysis by the exercise of due diligence.

(c) A prosecution for a Class A felony may be commenced at any time.

[25] Quinn argues that Indiana Code section 35-41-4-2(b)'s DNA extension to the statute of limitations violates federal and state constitutional prohibitions of ex post facto laws. Quinn did not present his ex post facto constitutional claims to the trial court. Instead, when Quinn moved to dismiss the charges of child molesting and criminal confinement, he alleged only that the State violated the statute of limitations. He did not present ex post facto claims at the evidentiary hearing on the motion to dismiss. Thus, he has procedurally defaulted his ex post facto claims for appellate review. *See Saunders v. State*, 848 N.E.2d 1117, 1122 (Ind. Ct. App. 2006) (constitutional claim waived for appellate review; defendant had presented a different claim to the trial court), *trans. denied*.

[26] Waiver notwithstanding, the DNA extension to the statute of limitations does not impose a punishment for an act that was not punishable at the time, nor

does it impose an additional punishment to that which was then prescribed. The DNA extension does not violate federal or state constitutional prohibitions of ex post facto laws. *See Minton v. State*, 802 N.E.2d 929, 934 (Ind. Ct. App. 2004) (statute extending the limitations period for the crime of child molesting was not an unconstitutional ex post facto law), *trans. denied*.

[27] Next, Quinn argues that the State failed to act with due diligence in discovering the DNA evidence that led the State to charge him with child molesting and criminal confinement. He concludes that the State failed to comply with Indiana Code section 35-41-4-2(b), and those charges should be dismissed.

[28] Our standard of review for the interpretation of statutes is de novo. *Wright v. State*, 772 N.E.2d 449, 454 (Ind. Ct. App. 2002). We review legal determinations to ascertain whether the trial court erred in application of the law. *Id.* Exceptions to statutes of limitations must be construed narrowly and in a light most favorable to the accused. *Sloan v. State*, 947 N.E.2d 917, 922 (Ind. 2011). When a statute is clear and unambiguous, we need not apply any rules of construction other than giving effect to the plain and ordinary meaning of the language. *Id.*

[29] We have not found any cases that define the circumstances under which the State may or may not be said to have acted with due diligence for purposes of Indiana Code section 35-41-4-2(b), and the parties have not directed us to any

cases on point.[3] The State analogizes this statutory requirement of due diligence to the use of that term in the context of newly-discovered evidence submitted by petitioners in post-conviction relief proceedings. That context is not comparable to this case, where the State bears the burden of proof beyond a reasonable doubt and exceptions to statutes of limitations must be construed narrowly.

[30] Due diligence is defined as: "The diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." Black's Law Dictionary 553 (Tenth Ed. 2014).

[31] Quinn notes that the State has had the sub-items since 1988, and the State took his DNA through buccal swabs in 2001 and 2003 in relation to other criminal cases. He contends that there is no reason why the State could not have created a DNA profile from the sub-items and uploaded it to CODIS years ago, thereby discovering Quinn's identity much sooner. He concludes that the State's delay was unreasonable.

---

[3] Quinn cites *Marshall v. State*, 832 N.E.2d 615 (Ind. Ct. App. 2005), *trans. denied*. That case is distinguishable because it did not address due diligence. Instead, a panel of the Court determined that Indiana Code section 35-41-4-2(b) did not apply because the State had discovered the defendant's identity using non-DNA evidence over a year before receiving the results of DNA testing.

A federal case from Indiana, *United States v. Hagler*, 700 F.3d 1091 (7th Cir. 2012), addressed the circumstances under which DNA evidence can toll the statute of limitations. However, that case addressed a federal statute that does not impose upon the prosecution a requirement of due diligence in locating and analyzing DNA evidence.

[32] The key inquiry for due diligence is whether the State's efforts to identify Quinn through DNA testing were reasonable under the circumstances. Here, although the State possessed sub-items containing Quinn's DNA in 1988, the sub-items' continued existence was a matter of happenstance because the State's Lab had no policy requiring retention of the sub-items when they were created. Retention of sub-items was left to the discretion of individual analysts, and many chose not to keep sub-items. Tr. p. 184 ("In the early days, before DNA analysis, they didn't even think that they needed to retain sub-items."). The Elkhart County Sheriff's Office had destroyed the evidence in its possession prior to 2000.

[33] The evidence also demonstrates that the Lab does not have the resources to proactively examine every sub-item in its vault to see if a DNA profile can be created. There are thousands of sub-items in the Lab's vault, and given staffing realities, Lab personnel act in response to requests from law enforcement agencies.

[34] In addition, the Elkhart County Sheriff's Department does not have the resources to leave every case open and routinely investigate them all. Instead, the Department places cases on inactive status once all avenues of investigation have been exhausted, subject to reactivating them when new information comes in. Although the Department's employees occasionally look at inactive cases, there is no formal policy or set schedule for such reexaminations.

When E.F. called Elkhart County officials for information about her case, she was by chance connected with Kenawell, one of the original detectives in the case, who had since retired and was working for a different agency. Kenawell happened to have a contact at the Lab who was able to begin the search for the sub-items. If E.F. had contacted county officials five or ten years earlier, the same connections may have been made and may have led to the same investigative outcome, but perhaps not. The possibility that different policies or investigation techniques could have led to Quinn's identification years earlier does not compel a conclusion that the State acted unreasonably here.

Quinn does not dispute that, once Kenawell and the Lab's employees determined that the sub-items still existed, they acted diligently in performing the testing and further investigation necessary to connect the DNA on the sub-items with Quinn.

Under the facts and circumstances of this case, the State's employees acted reasonably in the manner in which they maintained, discovered, and tested the DNA evidence that led to Quinn's convictions, thereby establishing the due diligence requirement of Indiana Code section 35-41-4-2(b). Quinn's request to vacate his child molesting and confinement convictions must fail.

## Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

Barnes, J., and Bradford, J., concur.