## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 19 2017, 5:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

**APPELLANT PRO SE**

J.B. Whitelow, Jr.
Carlisle, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy
Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

J.B. Whitelow, Jr.

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

December 19, 2017

Court of Appeals Case No.
45A03-1701-PC-129

Appeal from the Lake Superior
Court 3

The Honorable Diane Ross
Boswell, Judge

The Honorable Natalie Bokota,
Magistrate

Trial Court Cause No.
45G03-1206-PC-009

**Mathias, Judge.**

After this court affirmed his conviction for murder and attempted battery, J.B. Whitelow, Jr., ("Whitelow") filed a petition for post-conviction relief in the Lake Superior Court, which denied the petition. Whitelow appeals and presents eight issues, which we consolidate and restate as the following two: (1) whether the post-conviction court clearly erred in determining that Whitelow was not denied the effective assistance of trial counsel, and (2) whether the post-conviction court clearly erred in determining that Whitelow was not denied the effective assistance of appellate counsel.

We affirm.

## Facts and Procedural History

We summarized the facts underlying Whitelow's convictions in our memorandum decision on direct appeal as follows:

> In September 2008, an errantly thrown lemon slice mixed with hot tempers, leading to a scuffle and shooting death outside a bar in Hammond. Sometime between two and three o'clock in the morning on September 21, a bartender threw a slice of lemon to get the attention of a male patron, but by mistake hit Darnell Jones (a.k.a. "Dada"). Dada became angry, threw a glass, and was escorted out by Rob Moore (a.k.a. "House"), one of the bar's security guards. Upon exiting, Dada began to argue with House and Eric Lowe (a.k.a. "Herc"), another security guard. House and Herc followed Dada to his car, and Dada then swung open his car door, hitting Herc with it. House and Herc decided to detain Dada and call the police, and struggled to pull him from the car.

At this time House heard screaming nearby, saw a woman restraining a man he later identified as Whitelow, heard a gunshot, and then ducked behind a car parked next to Dada's. House then darted toward his own car to retrieve a gun, but en route remembered his gun was not in his car and instead ran back to the bar, where he alerted the other security guards to the shooting and told them to call 911. House then saw Herc begin to chase Whitelow.

Keith Berry (a.k.a. "Butch"), another security guard, also saw Herc chase Whitelow, and saw Whitelow point a gun and shoot Herc in the head. Butch ran up to Whitelow, put him in a headlock, and was lying on the ground holding Whitelow's head and neck while someone else kicked Butch in the head repeatedly and yelled at him to let go of Whitelow. At least one other joined the scuffle and yelled at Butch to let go of Whitelow. Herc died of his injuries.

Rodreon Jones accompanied Dada to the bar that evening and knew Whitelow. After the gunshots and scuffle, of which she personally saw and heard some but not all of what happened, she called Whitelow's cellular phone and asked him why he shot the security guard. He said "I didn't do that. I got blood all over my shirt and my pants," and then hung up.

Over a period of months in early 2009, Whitelow described the incident to Brandon Humphrey three or four times. Whitelow told Humphrey that his sister's child's father, Dada, was kicked out of the bar and was being hassled by a security guard, so Whitelow told the security guard to stop. Whitelow told Humphrey that a scuffle between him and the security guard ensued, during which Whitelow pulled out a gun and shot the guard three times. Whitelow told Humphrey he ran from the scene and burned his clothes. Whitelow also told Humphrey that the only witnesses were his sister's child's father and a second security guard, and that "if he got rid of both of them, that that

[sic] was [sic] the only people that could convict him in this case."

*Whitelow v. State*, No. 45A05-1009-CR-586, 2011 WL 3568238 at *1-2 (Ind. Ct. App. Aug. 15, 2011), *trans. denied* (record citations omitted).

[4] On October 7, 2008, the State charged Whitelow with murder, attempted murder, battery, and attempted battery. The State later alleged that Whitelow was a habitual offender. After the first trial ended in a mistrial, a second trial began in July 2010. At the conclusion of the retrial, the jury found Whitelow guilty of murder and attempted battery as a Class C felony. Whitelow waived his right to a jury trial on the habitual offender allegation, and the trial court found that Whitelow was a habitual offender. On August 20, 2010, the trial court sentenced Whitelow to consecutive sentences of fifty-five years for murder, four years for attempted battery, and thirty years for being a habitual offender, for a total of eighty-nine years of incarceration.

[5] Whitelow appealed and claimed that the trial court erred in admitting into evidence Whitelow's pre-trial statement to a witness, a witness's lay opinion testimony, and evidence of Whitelow's prior conviction for armed robbery. Whitelow also claimed that the State failed to present sufficient evidence to support his conviction for attempted battery. *Whitelow*, 2011 WL 3568238 at *1. We rejected these claims and affirmed Whitelow's convictions. *Id*. at *5.

[6] Whitelow then began his efforts to seek post-conviction relief. On June 1, 2012, Whitelow filed a pro se petition for post-conviction relief. On June 19, 2012, an

attorney with the Indiana Public Defender's office filed an appearance on Whitelow's behalf. But on January 15, 2013, this public defender withdrew his appearance. Before a hearing was held on his initial petition for post-conviction relief, Whitelow filed a second petition on September 9, 2013. A copy of this petition was sent to the Indiana Public Defender's office, which filed a notice of non-representation on October 16, 2013. On August 6, 2015, Whitelow requested permission to file an amended petition for post-conviction relief. The trial court granted the motion on September 14, 2015, and ordered the State to reply, which the State did on September 24, 2015.

[7] Also on September 24, 2015, the trial court held an evidentiary hearing on Whitelow's post-conviction petition. The only witness was Whitelow's trial counsel. On December 13, 2015, the trial court entered findings of fact and conclusions of law denying Whitelow's petition for post-conviction relief. Whitelow now appeals.

## Post-Conviction Standard of Review

[8] Post-conviction proceedings are not "super appeals" through which convicted persons can raise issues they failed to raise at trial or on direct appeal. *McCary v. State*, 761 N.E.2d 389, 391 (Ind. 2002). Post-conviction proceedings instead afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Davidson v. State*, 763 N.E.2d 441, 443 (Ind. 2002). The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Henley v. State*, 881 N.E.2d 639, 643 (Ind. 2008). Thus, on appeal from the denial of a petition for

post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id*. To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*. at 643–44.

The post-conviction court made specific findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). On review, we must determine if the court's findings are sufficient to support its judgment. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings for clear error. *Id*. Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id.*

## Ineffective Assistance of Trial Counsel

Our supreme court summarized the law regarding claims of ineffective assistance of trial counsel as follows:

> A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were

so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. The two prongs of the Strickland test are separate and independent inquiries. Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.

*Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001) (citations and quotations omitted).

# I. Whitelow's Claims of Ineffective Assistance of Trial Counsel

## A. Failure to Object to DNA Testimony

Whitelow presents several claims of ineffective assistance of trial counsel. The first of his claims is that his trial counsel was ineffective for not objecting to, and thereby excluding, the testimony of Rebecca Tobey ("Tobey"), a forensic scientist with the Indiana State Police who testified for the State with regard to

DNA evidence. In order to prove ineffective assistance of counsel due to the failure to object, Whitelow must prove that an objection would have been sustained if made and that he was prejudiced by the failure. *Wrinkles v. State*, 749 N.E.2d 1179, 1192 (Ind. 2001) (citing *Timberlake*, 690 N.E.2d at 259).

[12] Tobey testified at Whitelow's trial with regard to DNA testing performed on two pieces of evidence found in an alley near the scene of the shooting: an athletic shoe and a .25 caliber pistol. Tobey testified that DNA found on the shoe and pistol belonged to the victim, Lowe, to a reasonable degree of scientific certainty, and that two other individuals, one being Whitelow, could not be excluded as contributing to the DNA found on the items. Whitelow argues that Tobey's DNA analysis used only two "loci" of DNA matching, rather than the "13 loci or no less than 10 required by the Federal Bureau of Investigations." Appellant's Br. at 15.

[13] In support of his argument, Whitelow refers to an exhibit he submitted at the post-conviction hearing which consists of a printout describing the federal CODIS database. CODIS is an acronym for the FBI's Combined DNA Indexing System, which was put into service in the late 1990s. *Quinn v. State*, 45 N.E.3d 39, 43 (Ind. Ct. App. 2015). "CODIS is a nationwide DNA database and has sub-databases for each state. DNA profiles are stored in CODIS, and law enforcement agencies can compare DNA profiles generated from pieces of evidence against the DNA profiles in CODIS to find a match." *Id*. Indiana joined CODIS in 1996, *Patterson v. State*, 742 N.E.2d 4, 10 (Ind. Ct. App. 2000),

*clarified on reh'g* 744 N.E.2d 945 (2001), and started submitting DNA profiles to CODIS in 2000. *Quinn*, 45 N.E.3d at 43.

[14]   Whitelow appears to argue that the DNA samples taken from the shoe and pistol did not qualify for inclusion in the CODIS database, and that they were therefore inadmissible. But Whitelow cites no authority supporting the position that DNA evidence is inadmissible if it fails to meet the qualifications for inclusion to CODIS. His argument that his trial counsel was ineffective for failing to object to this evidence therefore fails.[1]

### B. Failure to Object to Photographic Array

[15]   Whitelow next argues that his trial counsel was ineffective for failing to object to evidence regarding a photographic array from which a witness, Roberto Martinez ("Martinez"), identified him as the shooter. Whitelow claims that the photographic array was unduly suggestive and that Martinez's identification of him from the array should not have been admitted. In addressing this claim, it is noteworthy that the array Whitelow now claims was unduly suggestive was not admitted into evidence at his trial. He claims that the array was unduly

---

[1] In his Appellant's Brief, Whitelow also argues that his trial counsel should have objected to Ms. Tobey's testimony based on Evidence Rule 702, which governs the admissibility of expert testimony. However, Whitelow never presented this claim in either his original or amended petition for post-conviction relief. "Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal." *Koons v. State*, 771 N.E.2d 685, 691 (Ind. Ct. App. 2002), *trans. denied* (citing Ind. Post-Conviction Rule 1(8); *Allen v. State*, 749 N.E.2d 1158 (Ind. 2001)). The failure to raise an alleged error in the petition waives the right to raise that issue on appeal. Accordingly, Whitelow's argument regarding Evidence Rule 702 is waived. *See id.*

suggestive and tainted Martinez's identification to the extent that Martinez should not have been allowed to identify him.

[16] The only photographic array in the record before us is one that was admitted at Whitelow's trial and used by a witness to identify Darnell Jones, not Whitelow. At the post-conviction hearing, Whitelow referred to another photographic array, and apparently showed his trial counsel a photocopy of this array. However, as noted by the post-conviction court, Whitelow never admitted this array into evidence at the post-conviction hearing. Because Whitelow failed to admit evidence supporting his claim regarding the photographic array, the trial court did not err in concluding that Whitelow failed to meet his burden of proof with regard to this allegation of ineffective assistance.

[17] Even if Whitelow had admitted the photographic array into evidence, and assuming that this array was unduly suggestive, there is nothing in the record to support Whitelow's argument that this array tainted Martinez's identification of Whitelow to the extent that the trial court would have suppressed Martinez's identification testimony.

[18] A witness who participates in an improper pre-trial identification may still identify the accused in court if the totality of the circumstances clearly shows that the witness has a basis for the in-court identification that is independent of the improper pre-trial identification. *Jones v. State*, 749 N.E.2d 575, 581 (Ind. Ct. App. 2001) (citing *Young v. State*, 700 N.E.2d 1143, 1146 (Ind. 1998)), *trans. denied*. The non-exhaustive list of factors to be considered in determining

whether an independent basis exists include: (1) the amount of time the witness was in the presence of the perpetrator; (2) the distance between the witness and the perpetrator; (3) the lighting conditions at the time; (4) the witness's degree of attention to the perpetrator; (5) the witness's capacity for observation; (6) the witness's opportunity to perceive particular characteristics of the perpetrator; (7) the accuracy of any prior description of the perpetrator by the witness; (8) the witness's level of certainty at the pre-trial identification; and (9) the length of time between the crime and the identification. *Id.*

[19] Whitelow's evidence before the post-conviction court addressed none of these factors, nor does his argument on appeal address them. He simply assumes that, if the photographic array was unduly suggestive, Martinez's identification would necessarily have been suppressed had his counsel objected to it. This is not the case. Suffice it to say that Whitelow has not demonstrated that his trial counsel was ineffective for failing to object to Martinez's in-court identification.

### C. Failure to Move for a Mistrial Based on Allegedly Perjured Testimony

[20] Whitelow next contends that his trial counsel was ineffective for failing to move for a mistrial based on the State's alleged subornation of perjury by various witnesses. Although Whitelow frames his argument as the failure to move for a mistrial, he also claims that his trial counsel was ineffective for failing to impeach various witnesses based on their allegedly perjured testimony.

[21] As noted by the post-conviction court, Whitelow's examples of "perjury" are simply instances of witness inconsistency. Perjury is a crime defined as making

a false, material statement under oath or affirmation, knowing the statement to be false or not believing it to be true, or knowingly making two or more material statements in a proceeding before a court or grand jury which are inconsistent to such a degree that one of them is necessarily false. Ind. Code § 35-44.1-2-1(a). It has long been held that that inconsistency alone is not enough to prove perjury. *Daniels v. State*, 658 N.E.2d 121, 123 (Ind. Ct. App. 1995). Furthermore, it is up to the jury to decide who is telling the truth. *See Wallace v. State*, 474 N.E.2d 1006, 1008 (Ind. 1985) (holding that State was under no duty to prevent testimony of witness who gave testimony contradicting another witness or force the witness to admit that he was lying, and that resolution of inconsistencies between witness's deposition and trial testimony which were brought out on cross-examination were for the jury to resolve). The remedy for knowingly false testimony is a charge of perjury, not exclusion of the evidence.

*1. Keith Berry's Testimony*

Whitelow argues that witness Keith Berry ("Berry") gave perjured testimony. Specifically, he claims that Berry lied when he testified at trial that he saw Whitelow shoot Lowe, the victim, in the head. Whitelow's trial counsel cross-examined Berry's testimony and confronted him with his prior deposition testimony in which Berry testified that he did not know where Lowe had been shot. Berry agreed with this and admitted that he did not actually see where Lowe had been shot. Whitelow now claims that this amounts to perjury. We disagree.

[23] At most, Berry's testimony was inconsistent with this prior deposition testimony. And when confronted with this inconsistency, Berry admitted that he did not actually know where Lowe had been shot. Moreover, as noted by the State, the medical evidence presented at the trial clearly shows that Lowe was, in fact, shot in the head.

[24] Whitelow also claims that Berry perjured himself when he testified that he saw Whitelow with a handgun. Berry initially testified that he saw "a gentleman with a gun pointing in the direction" of where Lowe was arguing with the bar patrons. Trial Tr. p. 140. He also testified that, after he and Lowe chased after the shooter, the shooter "was up against the fence in the alley and pointed the gun and shot [Lowe] in the head." *Id.* at 142. When asked what the weapon looked like, Berry testified, "It was black, very small, fit in like the palm of his hand." *Id.* at 146.

[25] On cross-examination, Berry testified that, when the shooter fired the initial shots, he did not actually see the weapon: "I'm sure it was too small. He was pointing in that direction. I technically never saw a gun, no." Trial Tr. p. 152–53. From this, it is apparent that although Berry saw Whitelow raise his arm and fire the gun, he never actually saw the weapon itself.

[26] Berry's testimony may have been inconsistent with regard to whether he saw the weapon, but this does not make his testimony perjury. Instead, his testimony contained inconsistencies that were brought to the jury's attention by the effective cross-examination of Whitelow's trial counsel, and there is no

indication that Berry knowingly testified falsely as is required for his testimony to constitute perjury.

[27] The same is true for Whitelow's argument that Berry perjured himself by testifying that he did not see anyone else with a gun on the night of the shooting. Whitelow notes that Berry admitted on cross-examination that he heard someone involved in the initial argument in the parking lot state, "I'm going to get my gun and shoot your asses." Trial Tr. p. 154. We fail to see how this contradicts Berry's other testimony, and even if it did, it would amount to little more than an inconsistency, not perjury.

[28] Whitelow also claims that Berry's testimony regarding the weapon was perjury because he told the police that he saw a man in a white shirt holding a gun. But Berry testified that he never made such a statement to the police and that the police report recording this statement was in error. Yet again, this inconsistency was little more than a matter of credibility that was for the jury to resolve. It does not establish that Berry's testimony was knowingly false.

*2. Rodreon Jones's Testimony*

[29] Whitelow also contends that Rodreon Jones ("Jones"), his ex-girlfriend, testified falsely to seeing Whitelow shoot a silver handgun during her deposition, but testified during trial that she did not see the gun. First, if, as Whitelow suggests, Jones testified truthfully at Whitelow's trial but falsely during her deposition, we fail to see how he was harmed. But more

importantly, viewing Jones's testimony in context reveals little to no inconsistency between her testimony during the deposition and at trial.

[30] Jones testified during her deposition that she saw something shiny in Whitelow's hand and agreed with counsel's description that the portion of the gun she saw was "chrome." Trial Tr. p. 329–30. At trial, however, Jones testified as follows:

> Q. Okay. Did you see the gun that he had?
> A. I just saw fire. I didn't really --
> Q. You didn't see the gun?
> A. I mean, probably some shiny, but when you see fire, what's your first instinct, not to move or anything and -- I don't know. I seen fire. I've seen fire and I've seen gunshots.
> Q. Okay. So you don't know. You just saw fire, you did not see the gun; is that correct?
> A. Something had to have been in his hand. You're not shooting firecrackers out in the parking lot.

Trial Tr. p. 328.

[31] This testimony is not terribly inconsistent with Jones's deposition testimony, where she stated that she saw something shiny in Whitelow's hand. Coupled with the fact that she consistently stated that she saw something fire from Whitelow's hand, it is apparent that Jones saw some portion of a metallic object in Whitelow's hand even if she did not see the entire gun. Yet again, this does not establish that Jones testified falsely, much less that she did so knowingly.

*3. Roberto Martinez's Testimony*

[32] Whitelow also claims that witness Roberto Martinez ("Martinez") committed perjury. Again, this argument is without merit. Martinez testified in his deposition that Lowe had to have been hit "in the chest . . . well, in the front of the body, the front body part," and later stated "[i]f it didn't hit him [Lowe] in the gut, it hit him in the chest." Trial Tr. pp. 523–25. At trial, however, Martinez testified on cross-examination as follows:

> Q. And you saw [Whitelow] pull the gun out and shoot him where?
> A. In this front part. (Indicating).
> Q. Well, you had a good vantage point; right?
> A. Right.
> Q. Could you see if he shot [Lowe] in the face, if he shot him in the chest?
> A. Yeah, toward the head part.
> Q. So you think he shot him in the head?
> A. Right.

Trial Tr. p. 477.

[33] Whitelow also complains that Martinez testified that he could not remember seeing anyone else with a gun on the night of the shooting, but during his deposition he testified that others present at the bar that night, including a man wearing a white shirt, had guns. According to a police report, Martinez also told the police that someone other than Whitelow fired two or three other shots

into Lowe as he lay in the alley. But during cross-examination at the trial, Martinez could not remember this.

[34] Yet again, all Whitelow has pointed out are inconsistencies between Martinez's prior statements and his testimony at trial. Whitelow has presented no evidence that would have required the post-conviction court to conclude that Martinez *knowingly* lied during his testimony.

*4. Brandon Humphrey's Testimony*

[35] The last witness Whitelow now claims committed perjury is Brandon Humphrey ("Humphrey"). During Humphrey's deposition, he testified that he had cousins in Hammond, Indiana, and he "got made aware of the story that was going around." Trial Tr. p. 1046. At trial, Humphrey testified that he had "heard about the shooting, but I didn't really know that [Whitelow] was involved." *Id*. at 1044. These two statements are not in conflict. And even if they were, Whitelow has provided no evidence that Humphrey's trial testimony was knowingly false.

[36] In short, Whitelow merely notes inconsistencies in the testimony of several witnesses. These inconsistencies were highlighted by the effective cross-examination of the very trial counsel Whitelow now claims was ineffective. But Whitelow has presented no evidence to support his claim that these witnesses knowingly provided false testimony. Because there is no evidence of perjury, Whitelow's trial counsel was not ineffective for failing to move for a mistrial based on this alleged perjury.

### D. Failure to Impeach

[37]     Whitelow next claims that his trial counsel was ineffective for failing to impeach certain witnesses on specific matters. He claims that his counsel was ineffective for failing to impeach the testimony of Berry and Martinez, both of whom testified that Whitelow shot Lowe in the head. According to Whitelow, Berry and Martinez should have been impeached with an autopsy diagram, which Whitelow claims "clearly shows that Mr. Lowe was never shot in the head." Appellant's Br. at 25. This argument is specious.

[38]     For one, Post-Conviction Exhibit 6, which Whitelow claims is the autopsy diagram, is not in the materials provided to us on appeal. Trial Exhibit 6 is simply a photograph of the bar where the shooting took place. Trial Exhibit 106 is an enlargement of a portion of Lowe's autopsy diagram. The forensic pathologist testified that the autopsy revealed a gunshot entrance and exit wound on the top of Lowe's head. Indeed, there are photographs in the record that graphically and explicitly show the gunshot wounds on Lowe's head. Attempting to impeach Berry or Martinez's testimony by claiming that the evidence did not show that Lowe had been shot in the head would have been more than futile—it would have been foolish.

[39]     Whitelow similarly argues that his counsel should have impeached Humphrey with the autopsy evidence. Humphrey, however, did not testify that he saw Whitelow shoot Lowe. He simply testified that Whitelow told him that he had shot Lowe in the face three times. Confronting Humphrey with evidence that Lowe had been shot in the head only once would not have impeached the

credibility of Humphrey's testimony, as Whitelow may have simply lied to Humphrey with regard to how many times he shot Lowe. And again, the autopsy evidence simply confirms that Lowe was shot in the head. We cannot say that Whitelow's trial counsel was ineffective for failing to reiterate this fact to the jury in an attempt to impeach Humphrey's credibility.

[40] Whitelow also claims that his trial counsel should have impeached the testimony of Jones with security camera footage that he baldly claims would have shown that her testimony was false. The post-conviction court reviewed the security camera recording and concluded:

> The surveillance footage is of such poor definition and quality that one cannot distinguish any specific actions by individuals other than blurry images of movement. Car lights flash on and off; people walk in and out of camera view and at no point can this court see the shooting at issue within the frame of the surveillance video. Whitelow presents no evidence of whether Ms. Jones is even in the frame of the area of the parking lot which is captured in the video. As such, the CD evidence neither supports nor refutes Ms. Jones'[s] description of what occurred at McTavern's.

Appellant's App., Vol. 2, p. 30.

[41] Whitelow in no way explains how Jones's testimony was contradicted by the video recording. As such, we are in no position to question the post-conviction court's conclusion that Whitelow's trial counsel was not ineffective for failing to impeach Jones's testimony with this video.

## *E. Failing to Request a Change of Venue*

[42] Whitelow also argues that his trial counsel was ineffective for failing to request a change of venue based on his allegation of pre-trial publicity. As our supreme court explained in *Ward v. State*:

> At the heart of the decision on a motion for change of venue is the right to an impartial jury. This right derives from the Sixth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, as well as Article One, Section Thirteen of the Indiana Constitution. A fair trial in a fair tribunal is a basic requirement of due process. A juror's verdict must be impartial regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. In essence the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors.

810 N.E.2d 1042, 1048–49 (Ind. 2004) (citations and internal quotations omitted).

[43] In seeking a change of venue, a defendant must demonstrate the existence of two distinct elements: (1) prejudicial pretrial publicity and (2) the inability of jurors to render an impartial verdict. *Id*. at 1049 (citing *Specht v. State*, 734 N.E.2d 239, 241 (Ind. 2000)). "Prejudicial pretrial publicity" means pretrial publicity that contains inflammatory material that would not be admissible at the defendant's trial or contains misstatements or distortions of the evidence given at trial. *Id*. (citing *Burdine v. State*, 515 N.E.2d 1085, 1092 (Ind. 1987)).

Here, of course, we must also view Whitelow's claim through the lens of his claim of ineffective assistance. That is, it was Whitelow's burden to establish that his trial counsel's decision not to seek a change of venue fell below an objective standard of reasonableness, and he must show that, but for this decision, the result of the proceeding would have been different. *See Timberlake*, 753 N.E.2d at 603.

Whitelow argues that the jury was exposed to "inflammatory" publicity prior to his trial. But the only evidence he presented to support his contention was the testimony of his trial counsel, who stated that Whitelow's case had "a little more publicity" than a typical case and that he agreed that jurors "heard or had some knowledge about the case." Post-Conviction Tr. pp. 32–33. This falls far short of establishing either element required of a defendant to entitle him to a change of venue. Without any evidence to support Whitelow's claim, the post-conviction court properly concluded that Whitelow's trial counsel was not ineffective for failing to move for a change of venue.

### F. Failure to Hire an Expert Witness

Whitelow next argues that his trial counsel was ineffective for failing to seek funds to hire an expert witness. A trial court is not required to appoint any expert that the defendant believes may be helpful, and the defendant bears the burden of demonstrating the need for the appointment, specifying precisely how he would benefit from the requested services. *Watson v. State*, 972 N.E.2d 378, 385 (Ind. Ct. App. 2012). Although there is no exhaustive list of considerations, the trial court's inquiry should address whether the services of the expert are

necessary to assure an adequate defense and whether the defendant precisely specifies how he would benefit from the requested expert services. The factors the court should consider in making such a determination include:

> (1) whether the services would bear on an issue generally regarded to be within the common experience of the average person, or on one for which an expert opinion would be necessary; (2) whether the requested expert services could nonetheless be performed by counsel; (3) whether the proposed expert could demonstrate that which the defendant desires from the expert; (4) whether the purpose for the expert appears to be only exploratory; (5) whether the expert services will go toward answering a substantial question in the case or simply an ancillary one; (6) the seriousness of the charge; (7) whether the State is relying upon an expert and expending substantial resources on the case; (8) whether a defendant with monetary resources would choose to hire such an expert; (9) the costs of the expert services; (10) the timeliness of the request for the expert and whether it was made in good faith; and (11) whether there is cumulative evidence of the defendant's guilt.

*Id*. Even where there are factors militating toward appointment of an expert— such as the services would have borne upon an issue outside the common experience of the average person, and analysis is outside the scope of the typical attorney's services—the factors may still be insufficient to require the trial court to approve the hiring of an expert at public expense. *Id*.

[47] Here, Whitelow notes that the State presented the testimony of several expert witnesses and then summarily concludes that his trial counsel should have requested an expert witness. However, Whitelow does not explain why or how the trial court would have been required to appoint an expert even if one had

been requested. As such, we cannot say that the post-conviction court clearly erred in rejecting this claim of ineffective assistance of trial counsel.

### G. Failure to Properly Advise with Regard to Habitual Offender Enhancement

[48] Whitelow next argues that his trial counsel was ineffective by allowing Whitelow to plead guilty to the habitual offender enhancement. Whitelow claims that his trial counsel misled him by informing him that if he did not plead guilty, he would receive the maximum possible thirty-year enhancement, but if he did plead guilty, he would not receive a thirty-year enhancement.

[49] Because the trial court attached the habitual offender enhancement to Whitelow's murder conviction, the trial court had no discretion but to impose a thirty-year habitual offender enhancement. *See* Ind. Code § 35-50-2-8(h)[2] (providing that the trial court *shall* sentence a person found to be habitual offender to "an additional fixed term that is not less than the advisory sentence for the underlying offense nor more than three (3) times the advisory sentence for the underlying offense. However, the additional sentence may not exceed thirty (30) years."). The advisory sentence for murder was fifty-five years, but the habitual offender enhancement could not exceed thirty years. Thus, a habitual offender enhancement for a murder conviction must be thirty years.

---

[2] We refer to the version of the habitual offender statute that was in effect at the time Whitelow committed his crimes. I.C. § 35-50-2-8 (2005).

Whitelow's claim appears to be based on a misstatement the trial court made at the sentencing hearing. Specifically, when pronouncing its sentence, the trial court initially stated that it was imposing a ten-year habitual offender enhancement. The prosecuting attorney then asked the court if the habitual offender enhancement was attached to the sentence for murder, to which the trial court responded, "Yes." Sentencing Tr. p. 54. The prosecuting attorney then stated, "Well, then by statute, I think you have to sentence him to 30 years." *Id*. The trial court then realized its earlier misstatement and imposed the required thirty-year habitual offender enhancement. *Id*. The trial court's written sentencing order reflects that the trial court entered a thirty-year habitual offender enhancement. Trial App., Vol. 2, p. 320.

We agree with the State that the trial court's brief misstatement provides no support for Whitelow's claim that his trial counsel misadvised him with regard to the habitual offender enhancement. Whitelow asked his trial counsel no questions regarding the advice he gave Whitelow with respect to pleading guilty to the habitual offender enhancement, nor did he present any other evidence or testimony supporting his claim that his trial counsel misadvised him. Because Whitelow presented no evidence to support his claim, the post-conviction court did not clearly err in rejecting it.

### H. Cumulative Error

Whitelow's last claim of ineffective assistance of trial counsel is that the cumulative effect of his trial counsel's errors requires us to reverse his convictions and grant him a new trial. Errors by counsel that are not

individually sufficient to prove ineffective representation may add up to ineffective assistance when viewed cumulatively. *McCullough v. State*, 973 N.E.2d 62, 75 (Ind. Ct. App. 2012) (citing *Pennycuff v. State*, 745 N.E.2d 804, 816–17 (Ind. 2001)), *trans. denied*. Here, however, Whitelow has not established that his trial counsel committed any errors. Thus, there are no errors to accumulate.

## II. Ineffective Assistance of Appellate Counsel

[53] Whitelow also claims that his appellate counsel was constitutionally ineffective for failing to present on direct appeal a claim that Whitelow's sentence was improper. When we review claims of ineffective assistance of appellate counsel, we use the same standard applied to claims of ineffective assistance of trial counsel, i.e., the post-conviction petitioner must show that appellate counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for the deficient performance of counsel, the result of the proceeding would have been different. *Manzano v. State*, 12 N.E.3d 321, 329 (Ind. Ct. App. 2014) (citing *Harris v. State*, 861 N.E.2d 1182, 1186 (Ind. 2007)), *trans. denied*. To show that counsel was ineffective for failing to raise an issue on appeal, the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential. *Id*. (citing *Reed v. State*, 856 N.E.2d 1189, 1195 (Ind. 2006)).

[54] To evaluate the performance prong when counsel failed to raise issues upon appeal, we apply the following test: (1) whether the unraised issues are significant and obvious from the face of the record and (2) whether the unraised

issues are "clearly stronger" than the raised issues. *Id*. If the analysis under this test demonstrates deficient performance, then we examine whether "the issues which . . . appellate counsel failed to raise, would have been clearly more likely to result in reversal or an order for a new trial." *Id*. at 329–30.

[55] Ineffective assistance is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel. *Id*. at 330. Indeed, our supreme court has warned that we "should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy," and we "should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made." *Reed*, 856 N.E.2d at 1196 (quoting *Bieghler v. State*, 690 N.E.2d 188, 194 (Ind. 1997)).

[56] Whitelow contends that his appellate counsel was ineffective for failing to challenge his sentence on direct appeal in several ways. First, he argues that the trial court abused its discretion by failing to include a reasonably detailed reason of circumstances as to why the court ordered Whitelow's sentences to be services to be served consecutively. We disagree.

[57] The trial court issued a written sentencing order which delineated three aggravating factors: (1) Whitelow's criminal history; (2) that Whitelow was on parole at the time he committed the instant offenses; and (3) that Whitelow's

"character, history of violent behavior, and his gang affiliation indicate [his] propensity to violence." Trial App. p. 320. In order to impose consecutive sentences, the trial court must find at least one aggravating factor. *Henderson v. State*, 44 N.E.3d 811, 814 (Ind. Ct. App. 2015). Here, the trial court found three aggravating factors. We therefore cannot fault Whitelow's appellate counsel for failing to present this meritless issue on direct appeal.

[58] Whitelow also claims that his appellate counsel should have argued that Whitelow's eighty-nine-year sentence was inappropriate in light of the nature of the offense and the character of the offender. However, he fails to explain in any detail precisely how his sentence is inappropriate. We therefore consider this argument to be waived. Waiver notwithstanding, Whitelow would not prevail. Whitelow was convicted of a senseless killing, and his character is demonstrated by his prior criminal history, which includes convictions for armed robbery, carrying a handgun without a license, and unlawful possession of a firearm. The pre-sentence investigation report also states that Whitelow was reported to have attacked another inmate while in jail. Whitelow was also sentenced for another murder at the same time as his sentencing on the instant offense. Under these facts and circumstances, the decision of Whitelow's appellate counsel to not bring a claim of an inappropriate sentence did not constitute ineffective assistance of trial counsel.

## Conclusion

[59] The post-conviction court did not clearly err in rejecting Whitelow's claims of ineffective assistance of trial and appellate counsel. Accordingly, we affirm the

judgment of the post-conviction court denying Whitelow's petition for post-conviction relief.

[60] Affirmed.

Vaidik, C.J., and Crone, J., concur.